**AT&T COMMUNICATIONS OF THE PACIFIC NORTHWEST, INC., Plaintiff,**

v.

**U S WEST COMMUNICATIONS, INC., The Public Utility Commission of Oregon and Roger Hamilton, Ron Eachus and Joan H. Smith as members of the Public Utility Commission in their Official Capacity, Defendants.**

**Civil No. 97–1578–JE.**

United States District Court, D. Oregon.

Dec. 11, 1998.

John F. McGrory, Mark P. Trinchero, Keith L. Kutler, Davis Wright Tremaine, Portland, OR, Daniel M. Waggoner, Kraig L.M. Baker, Davis Wright Tremaine, Seattle, WA, Maria Arias–Chapleau, Rebecca B. De-Cook, AT&T Communications of the Pacific Northwest, Inc, Denver, CO, for plaintiff AT&T Communications.

Lawrence H. Reichman, Chin See Ming, Perkins Coie, Portland, OR, Sherilyn C. Peterson, Kirstin S. Dodge, Perkins Coie, Bellevue, WA, Norton Cutler, U.S. West Communications, Inc., Denver, CO, for defendant U.S. West Communications.

Michael T. Weirich, W. Benny Won, Department of Justice, General Counsel, Salem, OR, for Roger Hamilton, Ron Eachus, Joan H. Smith, and Oregon Public Utility Commission.

Philip D. Barz, Emily M. Sweeney, Theodore C. Hirt, Leslie V. Batchelor, U.S. Department of Justice, Civil Division, Washington, DC, Herbert C. Sundby, U.S. Attorneys Office, Portland, OR, for Amicus Curiae Federal Communications Commission.

## OPINION AND ORDER

JELDERKS, United States Magistrate Judge.

Plaintiff AT&T Communications of the Pacific Northwest, Inc. ("AT&T") brings this

action against defendants U S West Communications, Inc. ("US West"), the Oregon Public Utility Commission ("PUC"), and PUC Commissioners Roger Hamilton, Ron Eachus, and Joan Smith ("the Commissioners"). The Federal Communications Commission ("FCC") has participated in this proceeding as *amicus curiae.*

The dispute concerns the same interconnection agreement between U.S. West and AT&T at issue in Civil No. 97–1575–JE. The background facts and procedural history are set forth in the prior opinion dated July 16, 1998, which denied the PUC's motion to dismiss. The parties have each moved for summary judgment.

### SCOPE AND STANDARD OF REVIEW

The Telecommunications Act of 1996 ("the Act"), Pub.L. No. 104–104, 110 Stat. 56, 47 U.S.C. § 153 *et seq.,* provides for federal district court review of interconnection agreements concluded pursuant to 47 U.S.C. § 252. "[A]ny party aggrieved" by a decision of a state public utilities commission concerning such an agreement "may bring an action in an appropriate Federal district court to determine whether the Agreement . . . meets the requirements of the Act." 47 U.S.C. § 252(e)(6). The Act does not specify either the standard or scope of review.

After some initial hesitation, the parties now generally agree that the scope of this court's review is limited to the administrative record. With regard to the standard of review, it is neither desirable nor practical for this court to sit as a surrogate public utilities commission to second-guess the decisions made by the state agency to which Congress has committed primary responsibility for implementing the Act in Oregon. Rather, this court's principal task is to determine whether the PUC properly interpreted and applied the Act, which is a question of federal law that is reviewed *de novo.*

In all other respects, review will be under the arbitrary and capricious standard.

### DISCUSSION

1. *Count I (reselling business services to residential customers)*

AT&T complains that the Agreement violates the Act by prohibiting it from reselling business services such as CENTREX to residential customers. The PUC responds that it did not require AT&T to include such a restriction and has no idea why AT&T elected to voluntarily do so. Under the circumstances, the court declines to intercede. The court expresses no opinion as to whether the PUC could, or should, permit AT&T to amend the Agreement.

2. *Count II (amount of wholesale discount on already discounted services)*

The dispute here concerns the wholesale discount given to AT & T when it resells services that already are subject to volume or term discounts. The arbitrator ruled that these services are subject to either (1) the basic 22 percent wholesale discount, or (2) the existing volume/term discount plus 11 percent, whichever is greater. Thus, if an item is already discounted by 20 percent, then the wholesale discount would be 31 percent (20 plus 11).

■ AT&T contends that it should be entitled to receive the full wholesale discount (22%) *in addition to* the full volume or term discount. The court disagrees. In all likelihood, the existing volume or term discount already takes into account some of the cost savings that could reasonably be achieved from selling the product at wholesale (e.g., billing, marketing, etc.). AT&T is not entitled to deduct the same cost savings twice. While there may be room for some additional savings, it is unlikely to be the full 22 percent. The arbitrator adjusted the wholesale discount rate accordingly.

Although less than exact (11% is one-half of 22%), this is a reasonable compromise for now. However, the PUC cannot rely on such estimates forever. It must proceed expeditiously with any studies or hearings needed to determine the additional costs savings that should reasonably result, and adjust the wholesale discount accordingly. The PUC may also consider whether to establish multiple discount rates if a single discount rate would not adequately reflect the savings that are available on certain products or classes of products.

3. *Count III (access charges on intrastate toll calls completed by AT & T)*

■ AT&T contends that the Agreement violates 47 U.S.C. § 252(d) because AT & T

must pay a Carrier Common Line Charge ("CCLC") when it completes intrastate toll calls. AT&T contends that it should be able to use unbundled network elements ("UNEs") that it purchases from U.S. West to avoid such charges. AT&T also argues that the cost of providing the switching service is already reflected in the cost of the UNE, hence the access charge is really an implicit universal service subsidy which, in AT&T's view, is unlawful under the Act.

The PUC responds that the CCLC is not a charge for the switching service provided by U.S. West. Rather, it is a surcharge that historically has been assessed on all toll calls in order to help U.S. West recover a portion of its embedded loop costs. However, this purpose conflicts with the FCC's emphasis on forward-looking pricing.

The PUC also argues that the CCLC furthers its universal service objectives. While the Act heralds some changes in universal service, Congress did not retreat from that ultimate goal. On the contrary, the Act requires "specific, predictable, and sufficient Federal and State mechanisms to preserve and advance universal service." 47 U.S.C. § 254(b)(5). Congress also mandated that "[a]ny such support should be explicit and sufficient to achieve the purposes of this section." § 254(e).

Congress contemplated that the state public utility commissions would continue to play a vital role in the preservation and advancement of universal service:

> A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State.

47 U.S.C. § 254(f). A recent report by the Federal–State Joint Board on Universal Service [1] likewise anticipates that the states will be in the forefront of efforts to provide universal service. *Second Recommended Decision*, CC Docket No. 96–45, 1998 WL 814511, —— FCC Rcd —— (November 25, 1998).

Although the Act does not preclude the PUC from imposing an explicit surcharge on all intrastate toll calls in order to fund universal service, the difficulty here is the manner in which the PUC has sought to accomplish this objective. The PUC may have the power to levy and collect a surcharge from AT&T to fund universal service, but U.S. West does not. *Cf. AT&T Communications of Calif. v. Pacific Bell*, 1998 WL 246652 (N.D.Cal.1998) (incumbent local exchange carriers may not levy access charges upon competitors to subsidize universal service). This surcharge is not part of the price for the unbundled elements provided by U.S. West, hence there is no reason for AT&T to pay this surcharge to U.S. West.[2] Moreover, in keeping with the rule that universal service subsidies should be explicit, there needs to be a clearer record of how much money has been collected and from whom, and where those funds are disbursed and for what purpose.

AT&T also alleges that the CCLC charge is discriminatory because U.S. West does not pay this fee. The PUC responds that although no money changes hands, the PUC imputes an equivalent sum to U.S. West's revenues and requires U.S. West to charge a high enough rate on intrastate toll calls to cover the imputed access charge. Again, this practice is contrary to the Act's emphasis on explicit universal service subsidies. The Act does not prohibit the PUC from levying an explicit universal service surcharge on intrastate toll calls, but this surcharge must be collected from all carriers, including U.S. West.

The PUC shall modify the Agreement consistent with this opinion.

### 4. Count IV (deaveraging loop prices and markup)

AT&T contends the PUC has violated the Act by (1) failing to "deaverage" loop prices,

---

1. The Federal–State Joint Board on Universal Service was established pursuant to 47 U.S.C. § 254(a)(1) and § 410(c).

2. This ruling is limited to the CCLC charge on intrastate toll calls. The court expresses no opinion regarding U.S. West's ability to recover, collect, or pass-on any other universal service costs or surcharges.

and (2) by arbitrarily adding a "markup" to increase the loop price above cost in order to compensate U.S. West for possible revenue erosion.

### A. Deaveraging Loop Prices

█ Historically, prices for local telephone service in Oregon have been averaged, so that each U.S. West customer pays the same basic rate for service (in a given category, such as residential or business) even though it costs more to provide service to some customers such as those in rural areas.

In computing the price for unbundled loops, the PUC set a single loop price based upon the average cost for U.S. West to provide a loop. AT & T contends that loop prices must be cost-based, hence the price that AT & T must pay U.S. West to use a loop in a dense urban area should be less than the price for a loop in a rural area. The court concludes that loop prices in Oregon are cost-based. The PUC simply chose to set a single loop price based upon the average cost of providing service rather than separately calculating the costs attributable to a particular loop and pricing each loop accordingly.

AT&T also contends that the PUC is unlawfully subsidizing rural service by allowing U.S. West to charge higher prices for urban loops. The FCC has filed an *amicus* brief supporting AT&T's position. The PUC considered AT&T's objections, but concluded that loop price deaveraging was premature until retail phone rates are also deaveraged. Under present rules, U.S. West must charge the same retail rate for service, regardless of how much it costs to serve a particular customer. In addition, U.S. West is required to provide service to anyone in its service area who requests it, whereas competitors such as AT&T can solicit the most profitable customers while leaving the remainder for U.S. West to serve.

The PUC has not refused to deaverage loop prices, but wants to do it in an orderly fashion. The PUC has agreed to consider deaveraging as part of PUC Docket UT 125.

The PUC's position makes sense. Although the Act contemplates a competitive world in which services are sold on the basis of cost alone, the reality is that we don't yet have a true free market. Rather, we have a hybrid system in which Competitive Local Exchange Carriers ("CLECs") are free to compete but Incumbent Local Exchange Carriers ("ILECs") such as U.S. West are still subject to extensive restrictions. Similarly, although the Act contemplates the establishment of new funding sources for universal service (*i.e.,* subsidizing higher cost customers such as those in rural areas), that goal remained elusive at the time the PUC was making its decision in 1996 and 1997 and is not fully operational even today.

The court also observes that it would be impractical to track the costs for providing service to each separate house, and charge a different rate. Accordingly, there will always be some cost averaging, and it is simply a question of how finely to draw the lines, where, and the criteria for that decision (*e.g.,* urban versus rural, north versus south). The PUC understandably wants to fully explore that question, and obtain input from the public and interested parties, instead of rushing into deaveraging.

The court is concerned by reports that the UT 125 proceeding (in which the PUC had planned to address deaveraging) has been delayed by a court challenge. While this court will not micro-manage the PUC's affairs, the PUC should address this issue in a timely fashion.

### B. Markup

AT&T contends that the PUC has violated the Act by arbitrarily adding a "markup" to increase the loop price above cost in order to compensate U.S. West for possible revenue erosion. There is some irony in AT&T's argument, since AT&T also filed a brief in Civil No. 97–1575–JE urging this court to affirm the PUC's loop price decision. The FCC has filed an amicus brief which acknowledges that the agency doesn't have all the facts, but generally supports AT&T's position on this issue.

█ The PUC responds that the challenged "markup" covers certain forward-looking costs that will be incurred by U.S. West in providing service but are not otherwise accounted for in calculating the loop price. Without this markup, U.S. West would not receive just and reasonable compensation for the use of its loops. The

PUC's explanation is reasonable and, given that understanding, the markup does not violate the Act.

### *ORDER*

The motions for summary judgment by plaintiff AT&T (docket # 37), defendants PUC and the Commissioners (docket # 41), and defendant U.S. West (docket # 44), are GRANTED IN PART AND DENIED IN PART. Defendants' motions for summary judgment are GRANTED as to Counts I, II, and IV. Plaintiff's motion for summary judgment is GRANTED as to Count III (access charges on intrastate toll calls completed by AT&T), and the PUC shall modify the Agreement consistent with this opinion.

IT IS SO ORDERED.